Your Honors, may it please the Court, Timothy Adams for G.M. Excuse me, let me grab my wallet. I'm struggling with a cold today. I'd like to reserve three minutes for rebuttal. All right, please watch the clock. Okay. This is a very simple issue case, Your Honors. It involves a child who was diagnosed with a major depressive disorder who the psychologist for the child had notified the school district that this child had a diagnosis, and that diagnosis was negatively impacting her education. She was failing multiple classes. She was spiraling downward, and the parent of this child had requested that the psychologist notify the district that she needed help. So he did that. So in October of 2009, an e-mail was sent to the school district staff member, Ms. Schultz, and asked Ms. Schultz, notified her that this child had this diagnosis, major depressive disorder, and that she needed some assistance. She was poorly in school, and the district needed to step in to provide that assistance. The district didn't respond immediately to that e-mail that was sent on October the 13th, 2009. About two days later, at an open house, the parent approached the counselor that the e-mail was sent to and asked her if she'd received the e-mail. And she said she told her she did, but she hadn't opened it yet. But she opened it very shortly afterwards, right? She did. So shortly after, she opened it, and she evidently referred it on to the school psychologist, but nothing was done in response. But in the meeting she had with the mother, she agreed to meet with her. She did. She agreed to meet with her. But unfortunately, there was no assessment plan created. And that's the biggest concern in this case, Your Honors, because the assessment plan is required under the district's obligation, the CHOP fine obligation. It's very clearly outlined. This court has held it. When was it triggered? It was triggered as soon as the notice was received. Which notice? That was the e-mail notice from Dr. Pollack. And why, in the content of that notice, would that, as a matter of law, have triggered it? Because we had a reason to suspect that there was a disability. Not only was there a reason to suspect, he said there was a disability. He was the treating psychologist and said, this child has a major depressive disorder. And two, that the reason to suspect that she needed special education services. She was failing multiple classes. That was impacting her education. He made that connection between these two. But the psychologist said to Ms. Schultz, the question was, didn't ask for an assessment, but if she would facilitate receiving the opportunity to do make-up work. Wasn't that? Well, when it comes to make-up, there's not magic language when it comes to referral for assessment. But you're making it magic. No, it's not magic, because this is the concern. The point here is that the child find obligation is an obligation that is on the school district as soon as there is reasonable suspicion. Correct. It's not on the doctor who tells the person, the school official who is apparently responsible for these things, that he has diagnosed this child with a major depression disorder to then ask for all the remedies under the IDEA and the state's child find law. That's correct. It's the school official. And here it seemed that the school official who got this information, who seemed to be in charge of this area, didn't recognize it for what it was. We agree, Your Honor, and that's why it concerned us. Looking at this case, looking at other than putting a billboard up saying, please assess this child, I don't know what other notice they could have issued. There is a lot of ignorance out there, both about the IDEA and its requirements, especially the child find requirement, which has not been litigated very much, and about mental health issues. Would you agree with that? I would agree with that. In fact, unfortunately, I think the district court was not very aware of all the related problems that us as student attorneys have to deal with. Unfortunately, the district court judges think very highly of him, and he's a very good friend. But unfortunately, I'm not sure he saw all the implications of the issue. Yes, unfortunately, I would agree as well, Your Honor. Getting to the point, here's a couple things that I'm really concerned about. Suppose we find a violation of the child find, but not of the FAPE, because I tend to agree with the district court that the FAPE was not about to couldn't be accomplished with all the events that had happened. However, I have sympathy for the mother who had a very sick, ill child who was rapidly descending into nowhere, that she had to do something. But if we were to find that, what happens to the award of attorney's fees? Well, for the district, I believe it would go away in the sense that we've prevailed and it's not frivolous. We completely obviously disagree, and unfortunately, the court... But, so, because you did not file a notice of appeal as to the attorney fee award, so how do we have jurisdiction over that? And by the way, I find it to be a very harsh award in these circumstances. Right, Your Honor. And the reason why we didn't file separate notices is because it was referenced in the original order, and we specifically referenced in our notice of appeal, given that the Honorable Judge Carter had said specifically that he intended or he invited them to file a motion for attorney's fees. That's your best argument. We could presume that that would come at some later time and that he would probably grant. In my practice, Your Honor, I rarely have that happen, especially in this type of field, and we would assume that that would happen in the future. Well, we have a case on point, which is possibly distinguishable because it involved the denial of award of attorney's fees as opposed to a grant of award of attorney's fees. But we pretty clearly say in that case that in order for us to have jurisdiction over the award, there has to be a separate notice of appeal. I guess it's in my other finding. You know which case I'm talking about. Yes, Your Honor, I believe so. Let me, if I can look through my notes. But can I make one point with regard to that? The award of attorney's fees was connected to the merits of this case. Had we prevailed on something in this case, the child fine, the denial of faith, there wouldn't be any basis for an award of attorney's fees against the parent in this case. There wouldn't be because we would have won something. And I think the Prescott case and Judge Kaczynski's were very clear in his opinion in that case that even if the parent didn't win, that doesn't make it frivolous. In this case, we would have won and there wouldn't be any basis for a claim. Well, so then you're suggesting what we would do is remand for reconsideration of the fees given that if we were to reverse and remand. The instruction to the court would be, I think it would need to be very clear that no aspect of this case or the intention of the student were frivolous. And so there would be no basis for the judge to open the door for an award of attorney's fees against the family. Are you also the counsel in the Capistrano case? I am not. I am not. But I'm familiar with that case, Your Honor. And I've spoken with the attorney who's representing on the appeal in that case. So we're very familiar with that case. I think the facts are highly distinguishable from ours, but it was interesting that Judge Carter used almost the identical language in our case as in that case. I mean, it was like verbatim. He clearly has concerns about policy on this. I know. There's many people who do. What's your best argument on the failure to provide faith in light of Judge Carter's findings that the mother failed to cooperate with getting that done? Judge Carter, I think, was confused by the timelines on this case because if you look back to her original due process complaint, it was filed in September of 2010. The only IEP that was in existence at the time was the March 26, 2010 IEP. So a lot of his discussion had to do with events that happened well beyond the due process complaints filing. It wasn't encompassed. And there was a lot of distraction about mother, whether she attended a subsequent IEP. I don't think any of that's relevant because he's focusing on an IEP that happened later. First of all, my client fully cooperated with everything that the district asked her to do. But even if she didn't, the law doesn't punish a parent for not cooperating. The law doesn't punish a parent for not returning calls or signing a blanket release. But the duty is toward the child. Exactly. Right. And so the school has an obligation to proceed. And if the mother doesn't cooperate, then she loses her place at the table, right? Sure. Exactly. If the school district has made an attempt and it's got documentation, all it needed to do was show that it made an attempt. Prepare an assessment plan. It's a simple form. It's one to two pages. You check off some boxes. Really simple. And I think part of the problem, Your Honors, was that Mrs. Schultz misunderstood. She kept talking about a learning disability. Well, if there's no learning disability, this child doesn't need help. Well, because she's capable. She can turn in her homework if she just turns in her homework. Well, a learning disability is broad, though. A learning disability could be for a variety of reasons, including, and there's no reason to believe that she didn't understand that major depressive disorder could cause a learning disability. So isn't that really unfair to say that she didn't understand? Well, we're talking about different eligibility categories, Your Honor. The California law puts a specific eligibility category on learning disabilities as different than other health and therapy, because ultimately she was determined eligible. Was she relying on California law when she made that statement? She was generous. In the context, she said she was having a learning disability. As a matter of fact, the psychologist noted that and said that the student has not taken complete responsibility for her academic procrastination and could show more effort. It does seem that she has, he said, it just seems that she had major depressive disorder, but she had relationships with friends and this and that. All sorts of, all sorts. So then in that respect, the learning disability could be a combination of a variety of different things, not the statutory issue that you're talking about. From a layperson's point of view, I suppose most everybody could just assume when you talk to a person on the street and you say, you know, they ask what I do and I say, well, I help people with. Let me ask. Sure. Is it clear from the record she was talking about the statutory learning disability, or was she talking about that very generically, that this, she was. It's possible it was generic, because she's not a lawyer and I don't think she understood all the, I mean, based on, I was the attorney that tried the case when I questioned her. I don't think she necessarily understood everything. But the bottom line is that the district has an obligation to educate its staff on the differences and how to notice what problem areas are, why referrals should happen. And we just kept kicking this can down the road, unfortunately. And just, okay, let's try this, let's try that. There was really no action taken when they had clear notice. So when you say, that's the point, though, clear notice,  we are seeking an alternative way to handle the situation. Why didn't it stop there? Thank you, she says. Well, there's a lot of alternatives, Your Honor. Many of my clients. No, the mother and the student are accepting alternative. Why did the school then say, wait a minute, wait a minute, come back. You need to come back here. We want to do something for your child. That's a good question. I don't know, and they should have. They should have said, here's an assessment plan we need to investigate. This is what school districts do. And what authority do you have for that? That when the mother unequivocally says. Compton Unified versus Addison. It says, unequivocally says, we are seeking an alternative way to handle the situation. And thank you. Why is it that the school at that time, the district, had an obligation to say, no, we're going to ignore what you're saying. You bring your child back here. We're going to do something about this. Well, all the districts had to do, they still have a legal obligation. At least looking at, if you look at Compton Unified versus Addison, 9th Circuit, 2010. This court, Department of Education versus Ray, 2001. It's clear that if there's notice that the child needs assistance, it's affecting her disability, it's affecting her education. Yes, notice, except that the parent who has responsibility for the minor says, we don't want your assistance, essentially. We're going somewhere else. But there is no law or case that says that the district's off the hook once that notice is given. There's no never mind under the law. Once notice is given, at least our understanding, my reading of not only the statute, the IDA, but these two cases I just cited. But how could they, if the mother says, we're out of here, we're not going to, our child. But that's not what she said. That's what she said. She says we are seeking an alternative way to handle the situation. Thank you. So they're supposed to do an assessment, an evaluation without the child. They're supposed to call her up and say, bring your child over here. We're going to do an assessment. But the law under Title 34 CFR 300-148, a parent can give notice if they don't feel that a school district is adequately addressing their needs and privately placed. In these circumstances, with that, with receiving that e-mail from the mother, what should the district have done as a matter of law? The district is still required, based on the IDA and the two cases that I cited, again, Addison case. I know what they're required to, you say they're required to. But factually, what should they have done? They should have, this is what they should have done. They should have prepared an assessment plan and said. How could they do that without the child? Well, they sat down with the mother in an SST meeting, a student study team meeting, and they had an opportunity to ask questions. They had this child. But they didn't have the child. They don't have to have the child. This is, we're talking about a counselor, a school counselor, Mrs. Schultz, and a school psychologist that later became involved. Mrs. Schultz was initially, she was the school counselor. She was responsible for, you know, assisting parents with, you know, various concerns about their children, you know, talking to parents about issues that may come up with classroom. There was no, they should have prepared some sort of document that at least offered it. Okay. Tell me what the document would have said. It is a proposed, with the law calls, it's a proposed assessment plan under California law, under federal law. The district has, once that child find obligation is triggered, they have to prepare this consent form. So they would have, they had, what you're saying is they had all the information they needed to prepare this report. What would it have said? It's not a report, though, Your Honor. Excuse me. I'm sorry. You're right. Prepare, prepare an assessment. It's just a consent form. It's like asking your doctor to look into this. It's really an investigation is what it is. That's what we, we don't even know at that point if she's eligible because there's been no investigation. So that's the concern is that, you know, unfortunately what the lower court had decided was that, you know, they didn't have enough information to determine eligibility. That wasn't the issue. Did they have enough information to refer this child for assessment? Did they have any suspicion? Well, it was really demand an assessment. Reasonable suspicion. Right. I think we're confusing. Sure. Reason to suspect a disability. Counsel, I think you're confusing the child find obligation with the, conflating the child find obligation with the faith. No, I'm not talking about the faith. I'm just talking about the referral, just the referral for assessment. My understanding of Judge Silver's question was about the referral piece. What should they have done? At what point? At what point? I'm not talking about the IEP. That's the faith claim. So this is just a pure, this is just applying the law to the facts. So you mean the child find obligation? Child find. So the IDEA creates an obligation on the school district to find and assess every child that it suspects has a disability that would impact her education. Just to see the kids that aren't even at the school. Yes. It could be a kid in a private school. They have an obligation to post information on websites. They, you know, do community outreach. They, you know, children in foster homes. We've got migrant children that they have an obligation to address. You're basically saying they should have demanded an assessment of the mother. Not demanded an assessment, Your Honor. Just created a piece of paper that takes literally seconds to click on print and say, here's our proposed assessment plan. They would then have an option to use whichever assessors they determined appropriate. Psychologists, you know, other therapists. But the mother would have to have participated. And she says, thank you. We're seeking alternative ways. But she did, Your Honor. She did sit down. She did have a discussion on October the 15th, even after the email was sent. In fact, to remind Mrs. Schultz that she sent, that the doctor had sent an email. You know, so they did sit, she did sit down. There was a student study team meeting, which is not a legally mandated requirement. They just sat, she sat down with the school psychologist. And there still wasn't an assessment plan created. How can they do an assessment plan without assessment? That's evaluating the child without all, basically what you've talked about is the precursors to an assessment. And then she says, I don't want an assessment. We're out of here. We're going somewhere else. But that's not what she said, Your Honor. Well, she said, she said, per the advice of the student's therapist, we are seeking an alternative way to handle the situation. Thank you. And then you're saying they should have ignored that and an assessment should have taken place without the participation of the mother, without the participation of the student? No, Your Honor. That is not, because the mother is investigating a variety of options. As a parent myself, if I have a concern, I'm going to investigate every possible option. One of the options is the public school system. They have a legal obligation to investigate. Now, when I say assess, we're talking about the first step is they create an assessment plan. There is a written document. Once the consent is given, let me just distinguish it. If mom had been given an assessment plan and she hadn't consented to it, then the district would have a great defense because there was no assessment plan returned that was signed. There was no consent. But mother is not a sophisticated person. She's not a lawyer. She doesn't understand special ed laws. She doesn't know what the district's supposed to do or not supposed to do. She's looking at all the options. She's looking public. She's looking private. She's talking to friends. She's trying to figure out what to do with her very sick daughter. And so, yes, as a parent myself, I would also investigate alternative options. I would investigate every option to help my child because that's all we can do as parents. Okay. You're way over your time. Okay. But since you were answering Judge Silver's questions, I'd let you go on. Thank you. Thank you, Roger. Good morning, Your Honors. Epiphany Owen on behalf of Saddleback Valley Unified School District. And first, I would just like to say that I agree that this court doesn't have jurisdiction to rule on the attorney's fees since notice wasn't properly filed and that's already been determined by this court. But to turn to what it seems like is the main issue for you is the child fine fees. Via motion, so we could reconsider it if we wanted to. I mean, that's if there was a valid reason to do that. Okay. Because we're now the merits panel. It's how the court works. Okay. But just so you know that. Thank you, Your Honor. So going back, I'd like to address your question about whether the school counselor was speaking of learning disability in a broad sense, and I think it's important to distinguish that the disability category under the ID category is a specific, it's called specific learning disability or SLD. But oftentimes, people do refer to learning disabilities in a broader sense that would cover a number of them. And I'd like to talk about the email from Dr. Pollack, the treating therapist at the time. That is the time that they argue that the district should have first been unwearing of its child fine obligation. At that point, the email merely said that she was having some concerns, and for one of the reasons was a major depressive disorder. It was a psychiatrist who said that he had diagnosed the child with a major depressive disorder. I believe he was a psychologist. Okay. He was a psychologist. He was her treating physician, right? Correct. Okay. But I think it's important to note that having a medical diagnosis does not mean that a student has a disability. Major depressive disorder isn't one of the categories. It could fall under other categories. It could fall under a variety of categories. Correct. Judge Silver is correct. It could fall under the learning disability, or it could be the emotional, or it could be other. There's three categories. Or other health impairments. But just having a medical diagnosis doesn't necessarily mean that there's reason to suspect that the child has a disability that would require special education services. Now, why is that in your view? Because I don't agree, but I'm just curious why you would think being told that the child's been diagnosed with a major depressive condition wouldn't lead a reasonable person to want to follow up on that, given their obligations under the child find law. Well, in this specific case, no one at the school was seeing any symptoms of depression. There was credible testimony from two of her teachers. Were they psychologists or psychiatrists? No, they are not. So how could they substitute their judgment without doing a reasonable investigation? The school psychologist, well, that was their testimony, that they weren't seeing any of those signs at the time. How would they know if they were seeing them or not if they had no special expertise in the area? Well, she was functioning in class. She was communicating with peers. She didn't seem withdrawn. She didn't seem sad. All the things that might lead to or symptoms of depression, they weren't seeing any of that. Do you think you're able to diagnose depression? No, I am not able to diagnose depression. Well, I'm just wondering, you know, you have a psychologist saying it. You've got a diagnosis. What more do you need? I mean, this girl, this young woman was spiraling toward death, I mean, over the course of this period of time. And just because the school didn't see it? There was also a school psychologist that met with the student and did not see any symptoms that she felt were indicative of depression. Yet the school did go on to try to meet its FAPE obligation. Well, I mean, if you look at the chronology of the way it happened, there was the email from the psychologist, and the school counselor at that time tried to meet with the parent to discuss it more and figure out, you know, if anything needed to be done at that point. And as you pointed out, the parent canceled that meeting and decided to go in a different direction. And then over a month later, the issue got raised again, and then the school psychologist at that point met with the parent. And again at that point, the parent decided that she did not want a special education assessment. They were going to agree to try some general education interventions, as the law requires, to see if that's... That's all related to FAPE, though. That would all be regarding whether they have a reason to suspect a disability. So that would be the child find piece. Well, I think I'm looking at it more narrowly and just focusing on the email as whether the email triggered the child find. So help us out with that. I agree with Judge Wardlaw. The timing here, I'm looking at the email, and it's just a pretty substantial statement about the severity of her mental state, but it takes a combination of a number of things. So arguably it could be a number of issues. Correct. But I did note that she also says that, asked if Ms. Schultz could facilitate receiving the opportunity to do makeup work. So was that the issue? The focus then was this woman or this child was suffering a variety of different things, boyfriends, maybe depressive disorder. She didn't complete her academic responsibilities. So that's the issue that we're looking at. Why wasn't, at that point, enough? Well, as you mentioned, he only requested makeup work, which certainly is not a special education service. That is something that would be entitled to any student that needed it at that point. So is it your position then that because it was a psychologist and the psychologist has done an assessment, found major depressive disorder, but then focused at the end that, gee, this is my request, that can she do makeup work? That all of that taken into combination wasn't enough? I would argue, no, that that is not enough. Again, like I discussed, a medical diagnosis is not equal to a disability, so the district wouldn't necessarily have a reason to believe that was a disability. And also he was only requesting makeup work. How many kids in the high schools in the school district you're recommending are walking around with major depressive disorders? Unfortunately, I think there are a number of students that have depression. I don't know that that was in the record anywhere. No, I'm just curious. Are the schools in your school district aware of those students? Are they doing anything for them? I mean, it would be on an individual basis. But, yes, if they think that there is a reason to suspect a disability, then they would assess based on their child plan obligation. But, again, I don't think that having depression is necessarily enough to trigger an assessment. I mean, especially when you think... It's not just depression. As Judge Wardlaw said, and as I've read here a couple of times, it does seem her major depressive disorder, not just depression. Lots of kids have depression. I think we could probably take judicial notice of that. But major depressive disorder, that's in the DSM whatever it is now, five. That's the question I think we're looking at here. Even though she, afterwards, and I give you, and as I talk to counsel for the appellant, she said, well, can she have makeup work? Right. Why wasn't there inquiry with major depressive disorder? She says that in the email. Well, the school staff testified that they didn't feel like that triggered a reason to suspect that she had a disability. And, again, they weren't seeing anything in the school environment to independently have. I mean, there was a school counselor involved. She had a number of teachers and a school psychologist, and they weren't seeing any of that in the school environment. So that mitigates that very strong assessment by a clinician that she had major depressive disorder, is that they took that in context with everything else, the circumstances, and decided an assessment was not, it didn't trigger an assessment. Correct. And as your Honor pointed out earlier, the school counselor set a meeting with her the very night that she read the email, and it was brought to her attention, set an email with the parent so she could get more information and to discuss it further with her. She also responded to the treating psychologist and told her that she was going to discuss It's on the record that the treating psychologist never responded to anyone at the district again, never gave any more information, never any indication that they needed to do anything further, and then the parent canceled the meeting and, you know, basically didn't provide any further information, didn't provide any records. We're just talking about the one email at that point. There were no other records that were provided, whether from her treating physician or psychiatrist at that time. And the counselor also basically said to the mom when she canceled the meeting, please let me know if there's anything else I can do, and the mom never followed up at that point. So, you know, she felt, and since they weren't seeing it in the school environment, that there was no reason to suspect a disability that needed to be treated with special education services. And that's undisputed? Did she ask, is there anything else we can do? Yes, there's an email that's in the record. That's the email? Yes, and I believe she also testified to it, so it's cited in my brief. I can get the site for you if you'd like. What is the legal standard, the correct standard for triggering the child find obligation? We agree on what the correct legal standard is. It's basically whether a school district has a reason to suspect that the child has a disability, and then the second prong is in that the child would need special education services. Are you taking that from the District of Hawaii case? Yes. And you believe we should adopt that standard? I think that that is. I mean, that law as to what the standard is, how it's triggered. I think that that is the correct standard that would trigger the child find duty. But, you know, in this case, I don't think either prong was met. I don't think that they had reason to suspect that she had a disability or that special education services would be needed to address that disability. Do you realize it's an objective standard, not a subjective standard? I'm sorry, in what sense? In the sense that it's not what this particular Ms. Schultz interpreted the memo to be. It's whether a reasonable person in Ms. Schultz's position would be major depressive disorder and believe that the obligations under the child find law, to the extent she knew about the child find law, I don't know if there's evidence in the record about how familiar she was with the law, but to the extent she was aware of the requirements. So we would look at what a reasonable person would do, not what Ms. Schultz thought. Correct. I believe that there is evidence in the record that she understood the child find obligation. If we found a child find violation, what's the remedy? What would be the remedy in this case? I think in this case it would be to remand it to have further... I mean, in this particular case it would be to remand because even if there was a child find duty, I think you'd have to look at other factors to determine whether there would be any monetary remedy. Well, but on the facts of this case, what would you argue? That there is no monetary remedy or that there is one? Were there consequential damages? I would argue that there is no remedy. And on what basis? If it was determined that the district violated its child find obligation, I would argue that you need to look at other things because what they're seeking in this case is funding the residential treatment center and then the additional religious private school. So I would argue that you have to look at other factors under the law, such as they didn't provide the required 10-day notice before unilaterally removing her from the school district. You'd have to look at... One of the components you'd look at is the parent obstruction with the IEP process, which is clear in this case. And also... She immediately... She immediately... She got alternative care even though it wasn't through the district. So you're saying then that there really were no damages? Correct. That it would be just a procedural violation? Correct. So... But if it wasn't just a procedural violation, but it could be... I agree that that has not been analyzed in this case yet. But the law does provide, though, if the school failed to then go on and provide the fee and the child was put in another place that under the IDEA, at some point school districts are required to pay the additional expense. You're just arguing that in this case they wouldn't be. Correct. They could be required to pay for the private school, but you would have to look at the factors. There are a number of factors that I believe in this case wouldn't warrant any reimbursement. And like I mentioned, because there was no proper 10-day notice, they didn't give the district the opportunity. The notice was given over the winter break, and it wasn't even 10 days if you weren't counting the winter break. Also, you'd have to look at the obstruction and how it impeded the IEP process. Also, you'd have to look at whether... Because in this case, both schools were not certified by the state of California. For-profit schools, the second school she was at was a religious school. You'd also have to look at whether she obtained educational benefit from those placements. So none of those factors were discussed by either the administrative law decision or the district court. So I've spent about two days reading this record, and my understanding of it is that she ultimately graduated from the school. Was it Arizona? No. She was at a school in Utah. Utah. Okay. She graduated from that and then entered another high school in your district? No. She was at the residential training center, and then when she got discharged and came back, her parent didn't even let the district know she was coming back. She felt that it was none of the district's business, and it was personal. Why is this always about the mother? We're talking about the school's duty, not the mother. I just want to know what happened to the child. I'm trying to respond. Stop just slamming the mother, okay? Okay. So in October, when she got brought back, she went to Green, which is not a school within the district. I believe it's in the location of the district, but it's a private religious school. Has she now graduated? Well, she went on to revoke consent to special education, so we haven't heard of anything. She should have presumably graduated at this point, but I don't know for sure. Okay. Thanks. All right. Well, you're over your time, too, but does anybody have any questions? No. Okay. No? Okay. All right. Thank you very much. We will take this case under submission. But you went six minutes over. Yeah. Let's just move on because this is a long morning with several very difficult cases. Thank you. Both counsels did an excellent job, and I want to thank you for that argument.
judges: Silver, Noonan, Wardlaw